# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 14, 2015 Session

## STATE OF TENNESSEE v. MATTHEW WHITEHAIR

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-64154    David M. Bragg, Judge**

---

**No. M2014-00883-CCA-R3-CD – Filed March 8, 2016**

---

A Rutherford County Circuit Court Jury convicted the appellant, Matthew Whitehair, of two counts of aggravated sexual battery, a Class B felony; one count each of incest, statutory rape by an authority figure, and sexual battery by an authority figure, Class C felonies; five counts of attempted incest, a Class D felony; two counts of sexual battery, a Class E felony; and one count of assault, a Class A misdemeanor. After a sentencing hearing, the trial court sentenced him to an effective eight-year sentence to be served at 100% followed by seven years on supervised probation. On appeal, the appellant contends that the evidence is insufficient to support the convictions, that the trial court improperly limited cross-examination of the victim pursuant to Tennessee Rule of Evidence 412; that the trial court improperly allowed a nurse practitioner to testify as an expert; that the State committed prosecutorial misconduct; that the verdict as to count seventeen, sexual battery by an authority figure, was not unanimous; that defense counsel should have been allowed to review the victim's case file from the Department of Children's Services (DCS); that the appellant's convictions of aggravated sexual battery must be reduced to child abuse because aggravated sexual battery is not a lesser-included offense of the charged offense of rape of child; and that cumulative error warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

David L. Raybin and Benjamin K. Raybin (on appeal), Nashville, Tennessee, and D. Brock East and Guy R. Dotson, Jr. (at trial), Murfreesboro, Tennessee, for the appellant, Matthew Whitehair.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Senior Counsel; Jennings Hutson Jones, District Attorney General; and Laurel Axsom Hemenway, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

In February 2010, the Rutherford County Grand Jury indicted the appellant for rape of a child, a Class A felony, in counts one through three; rape by force or coercion, a Class B felony, in counts four and five; incest, a Class C felony, in counts six through thirteen; statutory rape by an authority figure, a Class C felony, in counts fourteen through sixteen; and sexual battery by an authority figure, a Class C felony, in count seventeen.  The victim of the alleged crimes was the appellant's adopted daughter.

The appellant's eight-day trial began on July 29, 2013.  Adam McGreevy testified that in October 2009, he was fifteen years old and the victim's boyfriend.  He and the victim attended different schools but the same church, and McGreevy went to the victim's home two or three times.  On one particular occasion, a Friday night, they watched a movie in the living room.  The victim's mother was out of town "on a missionary trip," but the appellant and the victim's younger brother were there.  The appellant watched television in another room and would come into the living room "every so often" to check on McGreevy and the victim.  At some point, McGreevy and the victim were lying next to each other on the couch, and the appellant asked them to sit up while he was in the room.  McGreevy was never on top of the victim, and the appellant was not angry and did not ask McGreevy to leave.

McGreevy testified that while he was at the home, he saw an "odd" incident in the kitchen.  He stated that the appellant "was behind [the victim] in an uncomfortable position" and that the appellant's arms were underneath the victim's arms.  Later that night, McGreevy and the victim walked outside, and McGreevy tried calling a friend to pick him up and take him home.  However, the friend did not answer his telephone, so the victim asked the appellant to take McGreevy home.  The victim started crying "a little bit," and McGreevy asked what was wrong.  The victim said that the appellant was angry about having to take McGreevy home and that "if he's mad, then he'll make me make him happy."  McGreevy asked what the victim meant, and she answered, "[W]hat do you think it means[?]"  The appellant came outside and "seemed a little aggravated" but drove McGreevy home.  The victim went with them, and the victim's brother also may have been present.

- 2 -

McGreevy testified that the next day, he and the victim texted each other in which they "talked a little bit more about what she [had] said." McGreevy spoke with his mother, and they decided to tell someone about the victim. They talked with their pastor, Mark Gregory, and Gregory "made the call."

On cross-examination, McGreevy denied that the appellant "walked in" on him and the victim "making out" on the couch. He acknowledged that he and the victim had been "making out" earlier but said that the appellant never saw them. Regarding the incident in the kitchen, McGreevy stated that he was sitting on the couch in the living room, which was separated from the kitchen by a breakfast bar. McGreevy "lifted himself up a little bit" and saw the appellant standing behind the victim "with his arms, kind of, in a suspicious way." McGreevy did not hear them say anything and could not see the appellant's hands. McGreevy stated, "I never said his hands were anywhere inappropriate."

McGreevy testified that the victim never told him anything specific about her relationship with the appellant but that, based on his conversation with her that night, he thought she was being molested. The victim asked McGreevy not to tell anyone, but McGreevy refused. No one talked during the ride from the victim's home to McGreevy's home, and McGreevy said the ride was very awkward because of what the victim had just told him. The following Tuesday, McGreevy received a text from the victim in which she stated, "It happened again." Based on the text, McGreevy thought the appellant had molested the victim the night before. However, McGreevy acknowledged that he did not know whether the victim was telling the truth and that he had no proof she was being sexually abused. On redirect examination, McGreevy testified that he had no reason not to believe the victim.

Detective Wayne Lawson of the Murfreesboro Police Department (MPD) testified that he went to the appellant's apartment in response to a possible child abuse report. Detective Lawson had coached little league football with the appellant and asked Detective Tommy Roberts to accompany him to the residence. When they arrived, the appellant answered the door. The officers told him that they needed to speak with the victim, and the appellant "pointed towards her bedroom." The appellant did not say anything, which Detective Lawson thought was odd, and Detective Roberts went to the victim's bedroom while Detective Lawson remained with the appellant. Detective Lawson said he and the appellant "had some small talk" for about five minutes. At that point, the appellant still had not asked why the officers were there, so Detective Lawson told him, "In case you're wondering why we're here, there's been a report made to Department of Children's Services about some inappropriate behavior between you and [the victim]." Detective Lawson asked the appellant, "There's not anything to that, is there[?]" The appellant answered, "There shouldn't be."

Detective Lawson testified that after Detective Roberts spoke with the victim, Detective Roberts told him that they needed to interview the victim further at the police department. The officers went to the police department, and the appellant followed in his car. The detectives interviewed the victim for at least two hours and arrested the appellant.

The nineteen-year-old victim testified that she was born in June 1994; that the appellant was her stepfather; and that she used to live with her mother, the appellant, and her younger brother in an apartment in Murfreesboro. The victim had known the appellant since she was three years old, and he adopted her when she was eleven. One night when the victim was eleven years old and in the sixth grade, she was sleeping in her bedroom with a night-light on. Her brother was sleeping in the same room on a trundle bed that was one or two feet away. The victim said she awoke with the appellant on top of her and "very sharp pains" in her lower abdomen. The victim could see the appellant's face and could see her brother sleeping with his back toward her. The State asked if anything went inside the victim, and she answered, "I believe so, but at the time, I was not aware of what sex was, so I did not understand what was going on." The victim then said that she felt the appellant's private part, that it was hard, and that she felt his private inside of her. She said that the appellant was "breathing pretty hard," that his head was next to hers, and that he did not say anything. The victim said that the incident lasted two to three minutes and that her mother was sleeping in the bedroom next to her bedroom.

The victim testified that her mother was very strict and that when she or her brother wanted to do something, they would ask the appellant and then the appellant would talk with their mother about it. When the victim was twelve years old and in the seventh grade, she wanted to go to a homecoming dance at school with a boy. She asked the appellant to talk with her mother, and the appellant told her, "You know what you have to do." The victim said she knew the appellant meant that she would have to have sex with him. They went into her parents' bedroom, and she and the appellant had vaginal intercourse on the bed. The victim said that the incident happened while it was still light outside, that her mother was not home, and that she "ended up going to the dance."

The victim testified that that same scenario happened twice more: one time when she wanted to go to a Valentine's Day dance in the seventh or eighth grade and one time when she wanted to open a MySpace computer account in the eighth grade. Both times, the victim had vaginal intercourse with the appellant in her parents' bedroom in exchange for his talking with her mother. The victim was not allowed to go to the Valentine's dance but was allowed to open the MySpace account. The victim said that if she ever said no to the appellant, he "made up reasons for [her] to be grounded" or "just acted mad

- 4 -

all day." She stated that despite their sexual relationship, she and the appellant were "actually pretty close." The victim said that during her sexual encounters with him, she dissociated herself from the situation and stared at objects on the wall. However, "once it was over, he was my dad again and we went on about our normal lives."

The victim testified that she had a boyfriend, "CJ," in the eighth grade. In the summer between eighth and ninth grade, CJ was going to North Carolina, and the victim wanted to see him before he left. She asked the appellant to ask her mother for permission. The victim was having her menstrual period and had anal intercourse with the appellant for the first time. The incident occurred in her parents' bedroom and was very painful. Afterward, the victim felt a warm liquid between her buttocks. She said she got to see CJ before he left. At some point, the victim and CJ "broke up." However, the victim wanted to start seeing CJ again, so she asked the appellant to talk with her mother and had sex with him so he would speak with her mother about it. The victim said she was thirteen or fourteen at the time of the incident.

The victim testified that in October 2009, her mother went on a mission trip to Africa for one or two weeks. While her mother as gone, the victim slept with the appellant in her parents' bed because he did not like to sleep alone. Adam McGreevy was the victim's boyfriend, and she wanted to go to the mall to see him. The victim asked the appellant for permission and had anal intercourse with him because she was having her menstrual period. The victim said that the anal intercourse "still hurt the same" and that she again felt a warm liquid between her buttocks. The appellant drove the victim to the mall to meet McGreevy. About October 9, the victim asked the appellant if McGreevy could come to their home, and she had sex with the appellant so McGreevy could visit. On the night of October 9, the victim and McGreevy watched a movie while lying on the couch. The appellant was in his bedroom watching a movie but came out every twenty to thirty minutes. The victim's brother also may have been at home. At some point, the victim was in the kitchen with the appellant. The appellant was standing behind her, put his arms around her, and touched her breasts over her clothes. McGreevy was sitting on the couch, but the victim could see the top of his head.

The victim testified that after she and McGreevy watched the movie, they went outside to wait for someone to pick up McGreevy. However, the victim ended up having to ask the appellant to drive McGreevy home. The victim said that the appellant "seemed annoyed" but not angry and that McGreevy was worried the appellant would be mad. The victim told McGreevy "not to worry about it, . . . if he is mad, he won't be mad for long." McGreevy asked what the victim meant and if the appellant was having sex with her. The victim nodded and looked away. The appellant drove McGreevy home, and the victim and her brother went with them. After taking McGreevy home, the appellant took the victim's cellular telephone. She said that he put it on the dashboard and that "it was

sliding back and forth." That night, the victim slept with the appellant in his bed. She said she did so because she had slept with him for the past week or two and was scared to sleep alone. The next morning, the appellant returned the victim's telephone to her.

The victim testified that the last time the appellant had sexual intercourse with her occurred in her parents' bedroom. During the incident, the victim stared at a mirror on the wall and "counted the swirls." Afterward, the victim texted McGreevy that "it had happened again." The victim and McGreevy talked about telling the victim's mother, but the victim did not want to break apart her family. McGreevy "ended up telling his mom and they called [someone]."

The victim testified that in addition to vaginal and anal sex, the appellant had oral sex with her. She said the appellant put his mouth on her private in his bedroom when she was fifteen and in high school. The appellant also put his mouth on her breasts one time in the hallway of their home. She stated that the appellant told her to lift up her shirt and bra and that she was fourteen or fifteen years old at the time of the incident.

The victim acknowledged that her family fell apart due to her claims and said that at the time of trial, she had not seen her mother in more than two years. The following exchange then occurred:

> Q. Now, I believe that we've talked about ten different things; is that correct?
>
> A. Yes, ma'am.
>
> Q. Now, at some point, you and I met to, discuss that we had to come up with certain things that you could talk about and couldn't; is that correct?
>
> A. Yes, ma'am.
>
> Q. And what was your understanding of that?
>
> A. My understanding of that was that those were the only things that I could talk about, that those were the only times I could talk about.

The victim stated that over the years, her mother had asked her two or three times if the appellant "had been doing anything" to her. The victim said she "always just, kind of, avoided the question." She said that she was telling the truth about the sexual abuse and

that "I would not lie about something like this."

On cross-examination,[1] the victim acknowledged that she had spoken with many people about her allegations. On the night the allegations were revealed, she spoke with the police and employees at the Child Advocacy Center (CAC). The victim also testified about the allegations at the appellant's preliminary hearing about one month later and at a juvenile court proceeding when she was still fifteen years old. She said her first sexual encounter with the appellant occurred in her parents' bedroom, not in her bedroom. The victim said that she was sleeping on the floor in their room because she used to have nightmares and that her mother was asleep in the bed her mother shared with the appellant. The victim awoke to the appellant's touching her breasts under her clothes and her vaginal area over her clothes. The victim's mother remained asleep in the same room during the touching. The victim said that she was eleven years old and scared at the time and that "[t]here were many times he touched me." Regarding the sexual encounter in her room with her brother only a few feet away, the victim acknowledged that she awoke with the appellant's penis inside of her. However, she then said that "I don't know at exactly what point I woke up" and that "[i]t could have been when he first did it, or partly through."

The victim acknowledged that she did not testify at the juvenile court proceeding about her allegations regarding the homecoming dance, the Valentine's Day dance, the MySpace account, or getting back together with CJ. She said that she did not remember the incidents at the time of the proceeding, that she had been in counseling for the past couple of years, and that "the more I talk about it, the more I remember." The victim said all of the incidents happened in the same way: the appellant would tell her, "You know what you have to do"; they would go into his bedroom; she would lie on the bed and pull down her pants and panties; the appellant would spit on his hand to lubricate his penis; and the appellant would penetrate her. The victim acknowledged that she had never mentioned the appellant's spitting on his hand previously and said that she remembered it just a few months before trial through counseling. She said that she never saw blood or semen after the appellant had vaginal sex with her and that she would pull up her pants and "go on about [her] life."

The victim testified that the first time the appellant had anal sex with her occurred when she wanted to see CJ before he left for the summer. The incident happened during the day, and she was in the eighth grade. She acknowledged testifying at the juvenile court proceeding that the incident happened at night in the seventh grade. She stated that she did not know CJ in the seventh grade and that she "could have very easily gotten confused." She said she felt semen on her buttocks afterward but acknowledged

---

[1] We note that portions of the victim's cross-examination testimony have been highlighted in the transcript included in the appellate record. Such alteration of the transcript is improper.

- 7 -

testifying at the juvenile court proceeding that there was no semen after the anal incidents.

The victim acknowledged that at the time of the appellant's arrest on October 13, 2009, he was working two jobs. He worked when she was at school and at night when she was asleep. However, while her mother was in Africa, the appellant took time off from work. The victim said that she could not remember the exact dates of the incidents that occurred while her mother was away and that she did not remember talking with McGreevy about the abuse after October 9. She acknowledged that according to a bill of particulars filed in this case, the appellant sexually penetrated her on October 9, which was "movie night" with McGreevy; that the appellant anally penetrated her "on or about October, 2009" when she asked to go to the mall with McGreevy; that the appellant vaginally penetrated her on October 12; and that the appellant kissed her breasts and had oral sex with her "on or before Fall Break." She said that the anal penetration occurred "sometime in the afternoon" and that she did not remember saying at the juvenile court hearing that the mall incident involved vaginal, not anal, intercourse. She said the appellant had vaginal intercourse with her on October 9 when she asked if McGreevy could come over to watch a movie. The victim acknowledged that the appellant saw her and McGreevy lying on the couch but denied that he caught them "making out" or that he made McGreevy leave. She also acknowledged hearing McGreevy's testimony about the incident in the kitchen and denied that the appellant came into the kitchen to order her to send McGreevy home.

The victim testified that the appellant's last sexual incident with her occurred on October 12. The victim said she awoke "in the middle of the night" with the appellant on top of her and his penis inside of her. The victim acknowledged that at the juvenile court hearing, she testified that the last incident occurred between 3:00 and 6:00 p.m. when she asked the appellant for permission to see McGreevy at the mall. She also acknowledged that her memory would have been better at the hearing, which was closer in time to the events. The victim never told her family, teachers, minister, doctor, or friends about the abuse, and her mother and brother never knew about it. She acknowledged having regular menstrual periods. The appellant never used a condom, and she never became pregnant. She said that other than her encounters with the appellant, she was not sexually active.

On redirect examination, the victim testified that on November 20, 2009, she testified at the appellant's preliminary hearing for three or four hours. No one was at the hearing to support her. The victim's mother was there but supported the appellant. The victim was asked at the hearing about whether the appellant had used lubrication, but the victim thought she was being asked about "some type of oil or lotion" and did not mention the appellant's spitting on his hand. In March 2010, the victim testified for six

hours in juvenile court, and her grandparents were present to support her. The victim's mother also was present but again supported the appellant. The State asked if the victim "would have gone through all this today if it didn't happen," and the victim answered, "Absolutely not. This has been very disrupting to my life." The victim said that she helped the district attorney's office prepare a bill of particulars in July 2010 and acknowledged that the bill of particulars was almost identical to her direct examination testimony. Regarding the first sexual incident, which occurred when she was sleeping on the floor in her parents' bedroom, the appellant "rolled himself off the bed, and then crawled on the floor, like a baby" to her. She said that the appellant always smelled like burned popcorn and that she, her mother, and her brother were "pretty heavy sleepers."

On recross-examination, the victim testified that she was awake when the appellant crawled on the floor and that she did not remember saying she awoke to find him on top of her. The victim acknowledged that her stories had been inconsistent but said that "[t]hat does not mean that I'm not telling the truth."

Sara Hampshire, designated as "an expert in the . . . field of nurse practitioner" by the trial court, testified that she had performed thousands of pelvic examinations during her career and that she conducted a routine pelvic exam on the victim on October 16 or 17, 2009. The victim's mother brought the victim to Hampshire's office "to determine whether [the victim] was telling" the truth about the sexual abuse. During the exam, Hampshire inserted a speculum into the victim's vagina. The victim was "totally cooperative" and "very stoic about the whole thing," which Hampshire said was unusual for a young woman having her first pelvic exam. Hampshire stated that the entrance to the victim's vagina was "not tight at all" and that her hymen, the tight ring of tissue around the entrance of the vagina, was "completely stretched." Hampshire said that the victim's pelvic exam was completely normal and that she could not say the victim was telling the truth about the abuse. However, based on the victim's stretched hymen, Hampshire concluded that the victim had been sexually active for "some time" and that the victim had engaged in numerous acts of vaginal intercourse. On cross-examination, Hampshire acknowledged that an unaroused female was more likely to experience abrasions, bruises, and tears during intercourse than an aroused female and that she saw no evidence of vaginal or anal trauma to the victim.

Julie Rosof-Williams testified that she worked as a family nurse practitioner for the Our Kids Center from 1991 to 2010. In the early morning hours of October 14, 2009, Rosof-Williams performed a "head to toe" examination of the victim due to "concerns of sexual abuse." The victim reported that her most recent sexual contact with the perpetrator had occurred about 9:30 p.m. on Monday, October 12, 2009, and the victim described a history of penile, vaginal penetration; digital, genital contact; digital, breast contact; oral, genital contact; and penile, anal contact. Rosof-Williams's examination of

the victim included a vaginal examination with a speculum and a rectal exam, and she collected samples during the exams and sent them to the Tennessee Bureau of Investigation (TBI). She said that the victim had normal anal and hymenal tissue and that the victim's vaginal and rectal exams were normal, which did not mean the victim had not been sexually abused. The victim appeared healthy and normal, was cooperative, and did not appear to be in any acute distress. Rosof-Williams stated that she personally had received gynecological services from Sara Hampshire and that she had found Hampshire to be "a very capable nurse practitioner."

On cross-examination, Rosof-Williams testified that unlubricated intercourse increased the likelihood of injury. She acknowledged that she saw no physical trauma to the victim or any evidence to prove conclusively that the victim had had sexual intercourse. She also acknowledged that anal intercourse could cause a loss of "tone" in the area and that she saw no loss of tone in this case.

Debra Withey, the victim's maternal grandmother, testified that she lived in New York state. The victim's family used to live in New York but moved to Tennessee in July 2005, right after the victim turned eleven years old. Withey talked with the victim on the telephone periodically after October 13, 2009, but did not learn about the victim's allegations until February 12, 2010. She did not know anything about the victim's claims at the time of the appellant's preliminary hearing in 2009 but was present when the victim testified in juvenile court in March 2010.

Detective Tommy Roberts of the MPD testified that the police department received a call from Pastor Mark Gregory regarding the victim at 7:13 p.m. on October 13, 2009. Later that evening, Detective Roberts met Detective Lawson at the appellant's home. Detective Roberts knocked on the door, the appellant answered, and Detective Roberts asked to speak with the victim. The appellant did not say anything to Detective Roberts but "just kind of pointed that way." Detective Roberts went to the victim's bedroom and spoke with her for less than fifteen minutes. He said that he noticed the apartment was "absolutely immaculate," that he mentioned the cleanliness to the appellant, and that the appellant "made some comment about he was getting ready for his wife to come back home."

Detective Roberts testified that he had the victim transported to the police department. Later, the victim went to the Our Kids Center. Detective Roberts said that during his investigation, he interviewed Adam McGreevy and the victim's mother and obtained a search warrant to collect the appellant's DNA. On cross-examination, Detective Roberts acknowledged that he did not obtain a search warrant for the apartment and did not collect any clothing or bedding.

- 10 -

Candace McGreevy, Adam McGreevy's mother, testified that on October 10, 2009, she and Adam[2] had a conversation about the victim. Adam was very upset, but he and Candace planned not to tell anyone until the victim's mother returned from Africa on October 14. However, Adam was "very frustrated" about the situation, so he and Candace asked Candace's sister, Carol Ruckart, for advice. Ultimately, their pastor, Mark Gregory, called the police.

Carol Ruckart testified that her nephew, Adam McGreevy, and her sister, Candace McGreevy, came to her home on Tuesday, October 13, 2009. Ruckart spoke with them and telephoned Mark Gregory, "who is pastor of all of us." Gregory came to her home and called the police.

Pastor Mark Gregory testified that the victim and her family began attending his church in 2006. One evening in October 2009, Gregory received a telephone call from Carol Ruckart. He went to her home and spoke with her, Adam McGreevy, and Candace McGreevy. Based on their conversation, Gregory telephoned the police.

Pam East testified that she was an elementary school teacher and that the victim's mother used to be her educational assistant. On the night of October 13, 2009, East received a call from Carol Ruckart. East said that the first thing she did was tell East, "[S]he lies. Carol, she lies." After speaking with Ruckart, East went to a hospital in Murfreesboro to be with the victim because East knew the victim's mother was in Africa. However, unbeknownst to East, the victim had been taken to a hospital in Nashville, so East did not get to see her. The next day, East picked up the victim's mother from the airport and drove her to the police department. That night, the victim spent the night at East's home, and East told her, "[I]f you are telling the truth, you're doing the right thing. If you are lying, it needs to stop now." The victim did not respond to East's statements.

Patrick Ihrie testified that in 2009, he was a special agent forensic scientist for the TBI Crime Laboratory's DNA and Serology Unit. Ihrie analyzed evidence collected in this case, specifically vaginal swabs collected from the victim. Ihrie did not find semen on the swabs.

Kevin Smith, an investigator with the Department of Children's Services (DCS), testified that on the evening of October 13, 2009, the Department received a referral about the victim and notified Smith. Smith went to the MPD and met with Detectives Lawson and Roberts. He also observed portions of their interview with the victim and spoke briefly with the victim's brother. Smith transported the victim and her paternal grandmother to the Our Kids Center, and they arrived shortly after 1:00 a.m. on October

---

[2] Because the witnesses share a surname, we will refer to them briefly by their first names for clarity. We mean no disrespect to these individuals.

14. Smith also transported the victim and her grandmother from the Our Kids Center to the victim's grandmother's house. Later on the morning of October 14, the victim was interviewed at the Child Advocacy Center. Smith and the detectives watched the victim's interview on a television in an adjacent room.

At the conclusion of Smith's testimony, the State rested its case and presented the following election of offenses: count one, rape of a child, and count six, incest, for the appellant's vaginally penetrating the victim on her bed in her bedroom when she was "near" the sixth grade and eleven years old; count two, rape of a child, and count seven, incest, for the appellant's having vaginal intercourse with the victim, who was in the seventh grade and under the age of thirteen, on his bed in his bedroom when the victim asked to have a boyfriend and go to a homecoming dance; count three, rape of a child, and count eight, incest, for the appellant's having vaginal intercourse with the victim, who was in the seventh grade and under the age of thirteen, on his bed in his bedroom when the victim asked to go to a Valentine's dance; count four, rape by force or coercion, and count nine, incest, for the appellant's having vaginal intercourse with the victim, who was in the eighth grade and under the age of fifteen, on his bed in his bedroom when the victim wanted a MySpace account; count five, rape by force or coercion, for the appellant's having anal intercourse with the victim, who was under the age of fifteen, when the victim wanted to see her boyfriend before he left town and was on her menstrual cycle; count ten, incest, for the appellant's sexually penetrating the victim, "possibly [on] October 9, 2009[,]" when the appellant rented movies and watched them in the home with the victim's boyfriend; count eleven, incest, and count fourteen, statutory rape by an authority figure, for the appellant's having anal intercourse with the victim, who was approximately in the tenth grade and fifteen years old, in October 2009 when the victim wanted to go to the mall with her boyfriend while her mother was in Africa; count twelve, incest, and count seventeen, sexual battery by an authority figure, for the appellant's lifting the victim's shirt, kissing her breasts, and having oral sex with her when she was over the age of thirteen but under eighteen; count thirteen, incest, and count sixteen, statutory rape by an authority figure, for the appellant's having vaginal intercourse with the victim, who was about fourteen years old and going into the ninth grade, when the victim wanted to reconcile with her boyfriend and asked the appellant to talk with her mother about it; and count fifteen, statutory rape by an authority figure, for the appellant's vaginally penetrating the victim, who was in the tenth grade and about fifteen years old, on October 12, 2009, in his bedroom.

JW[3], the victim's sixteen-year-old brother and the appellant's son, testified that he was eight years old when the victim was eleven and that he used to sleep in her bedroom. They slept in the same bedroom for three years, and he slept less than five feet from her

---

[3] Because the witness is a minor, we will refer to him by his initials.

on a trundle bed that he pulled out from under her daybed. JW said he did not remember the appellant's ever coming into the room during the night. He said that he and the victim would get out of bed if they needed a drink, were sick, or had a nightmare and that he felt her get out of bed sometimes because she had to crawl over him. He said that he never awoke to find the appellant in bed with the victim and that the victim never told him the appellant was touching her. The appellant never made inappropriate statements about the victim in front JW, and JW never heard the appellant tell her that "you know what you have to do." JW also never heard the victim ask the appellant if she could see her boyfriend and never noticed the appellant and the victim spend time alone in the appellant's bedroom.

JW testified that in the fall of 2009, he was twelve years old. He said that he remembered Adam McGreevy coming to their home on October 9 and that McGreevy and the victim watched a movie in the living room while JW and the appellant watched a movie in another room. The appellant sent JW into the living room to check on the victim and McGreevy, and nothing seemed unusual to JW. Later that night, the appellant had to drive McGreevy home, and the victim and JW went with them. JW described the mood during the drive as "strange" and said that no one spoke. After the appellant dropped off McGreevy, the appellant asked for the victim's cellular telephone and "tossed it up on the dashboard." JW said he loved the appellant "with all [his] heart." He said that the victim was a liar, that she had a reputation for not telling the truth, and that she had a reputation for untruthfulness in 2009.

On cross-examination, JW testified that the victim may have slept in their parents' bedroom sometimes but that he did not remember. He also did not remember if the appellant went to work while his mother was in Africa. On redirect examination, JW testified that the victim slept in her own bedroom while their mother was away.

Melissa Whitehair, the victim's mother and the appellant's wife, testified that at the time of trial, she and the appellant had been married fifteen years and lived with their son, JW, in the same apartment they had lived in since 2005. The family, including the victim, moved to Tennessee when the victim was eleven and JW was eight years old. Mrs. Whitehair worked at an elementary school and was responsible for taking the children to school and granting permission to see their friends. The victim and JW usually asked Mrs. Whitehair for permission to do things, and the appellant typically did not ask for permission on their behalf.

Mrs. Whitehair testified that their apartment had three bedrooms and that she and the appellant slept in the master bedroom every night. For several years, the victim and JW slept in a second bedroom that shared a wall with the master bedroom. However, by 2009, the victim was sleeping in the third bedroom in the front of the apartment. Mrs.

- 13 -

Whitehair said that the children usually went to bed at 8:30 p.m., that she usually went to bed at 10:00 p.m., and that the appellant either went to bed with her or before she did if she had laundry to do. Mrs. Whitehair stated that she was a "fairly light sleeper" and that the appellant sometimes got up in the night to use the restroom or get a drink of water. He also would get up if the children were sick or if the victim was afraid of lightening. Defense counsel asked if the appellant ever got out of bed and she did not know where he was, and she answered no.

Mrs. Whitehair testified that she was responsible for the family's laundry and that she never noticed any stains on the bed sheets. She also never noticed any drastic change in the victim's behavior. She said that the victim frequently lied and told stories and that she had to punish the victim for lying. The victim would become defensive when confronted.

Mrs. Whitehair testified that in the fall of 2009, the appellant was working two, full-time jobs. He worked at Mahle Filters at night and Century Mold during the day. Mrs. Whitehair went on a mission trip to Africa on October 3 and returned on October 14. During her trip home, she telephoned the appellant from Chicago and learned about the victim's allegations. She said that the allegations came as a shock, that she never had any suspicion the appellant was abusing the victim, and that she "ended up falling down in the airport."

On cross-examination, Mrs. Whitehair acknowledged that the victim would sleep on the floor of the master bedroom if the victim was scared. Sometimes, Mrs. Whitehair would wake up and find the victim sleeping on the floor. Mrs. Whitehair acknowledged that she could be strict at times but denied that she was strict most of the time. She said that she occasionally got home from work after the appellant but that the children were with her. The victim was home alone with the appellant only "[o]nce in a while." Mrs. Whitehair acknowledged that the victim asked to attend dances but said that she did not specifically remember the victim's asking to attend a Valentine's Day dance. Mrs. Whitehair denied coming home early from a "function" and hearing the appellant running down the hallway of their apartment. She also denied arguing with the appellant or asking the victim if the appellant had touched her.

Mrs. Whitehair testified that while she was in Africa, she spoke with the appellant on the telephone, and he asked if Adam McGreevy could come to the apartment. She told the appellant that McGreevy could come over "as long as it was monitored." Mrs. Whitehair acknowledged that the appellant took time off from work to look after the children while she was gone. She also acknowledged that she did not know what happened in the apartment while she was away. On October 14, 2009, Mrs. Whitehair went from the airport to the police department. She spoke with the detectives and the

victim, but she did not hug the victim. Mrs. Whitehair asked the victim if the allegations were true. She also asked the victim if the appellant wore anything on his penis and wondered "why we didn't have a pregnancy." Mrs. Whitehair said that at first, she was "back and forth" between supporting the victim and the appellant. She said that the victim had "cause[d] trouble amongst her peers" in the past and that the victim had "a history of lying." She acknowledged that after the victim's allegations surfaced, she put Bible verses about liars and lying around the apartment.

On redirect examination, Mrs. Whitehair testified that prior to the victim's allegations, she would leave the children alone with the appellant and did not have any concerns about doing so. When she learned about the victim's claims, she looked at telephone records and had the appellant "retrace his steps as far as where he was and work." She also arranged for the victim to have a gynecological exam with Sara Hampshire in hopes that Hampshire would be able to determine whether the victim was still a virgin and took the victim to see the victim's pediatrician. Mrs. Whitehair said that she conducted her own investigation because she wanted to know the truth and that she started to suspect the victim was lying on October 14 when she talked to the victim at the police department. Mrs. Whitehair stated, "It . . . just seemed to be the same demeanor with any other story or lie that [the victim] had told." Mrs. Whitehair finally decided that the victim was lying when Mrs. Whitehair attended the appellant's preliminary hearing.

Marcie Castleberry, the victim's pediatrician, testified as an expert in pediatric medicine that she first saw the victim when the victim was eleven years old and that she last saw the victim on April 16, 2010. Dr. Castleberry never noticed any signs of sexual abuse, and no one mentioned the victim's abuse allegations to her on April 16. Dr. Castleberry asked the victim outside of Melissa Whitehair's presence if the victim had ever had sex, and the victim said no.

Nineteen-year-old Jennifer Silva testified that she had known the victim since the sixth grade and that they went to school and church together. In October 2009, Jennifer[4] and the victim were best friends. Jennifer said that the victim was "dishonest at times" and that the victim would tell lies "quite often." Regarding the victim's character for truthfulness, Jennifer said that she was "dishonest a lot." On cross-examination, Jennifer acknowledged that she also had lied in the past, that she sometimes worked for Melissa Whitehair, and that Mrs. Whitehair was her "boss."

Nineteen-year-old Jessica Silva, Jennifer's twin, testified that she met the victim through Jennifer and that they went to school and church together. She said that she and the victim were very good friends and that the victim was not truthful or honest. On

_____
[4] Because the witness shares a surname with another witness, we will refer to them by their first names for clarity. We mean no disrespect to these individuals.

cross-examination, Jessica testified that sometime after the victim's allegations surfaced, the victim moved to New York. Jessica and the victim remained friends until that time. Jessica acknowledged that she also had lied in the past but said that she did not do so often. She acknowledged that she had trusted the victim and that the victim had not revealed Jessica's secrets.

Ashley Marshall Fears testified that she used to teach at the victim's high school and coached the school's dance team. The victim was on the dance team, and Fears got to know the victim well. She said the victim "tended to not be truthful." On cross-examination, Fears testified that she began coaching the victim in July 2009. She acknowledged that she and the victim's mother were friends and that they used to talk on the telephone. She said that she had to put the victim on "probation" for the dance team because the victim was not working hard and because the victim's grades were poor. The victim's grades were poor before and after the victim's allegations about the appellant surfaced. Fears said that the victim was very quiet and that she was not a behavior problem.

The thirty-nine-year-old appellant testified that he began dating Melissa Whitehair when the victim was eighteen months old and that they married when the victim was two and one-half years old. The appellant adopted the victim when she was eleven, and the family subsequently moved from New York to Tennessee where the appellant worked for Century Mold. In January 2009, the appellant left Century Mold and began working for Mahle Filter Systems. About six months later, the appellant began working again for Century Mold and worked both jobs. He explained that his work week began at 9:45 p.m. on Sunday night when he left home to drive to Mahle. The appellant would work at Mahle until 6:00 a.m., go home, shower, and be at Century Mold at 7:00 a.m. He would work there until 4:15 p.m., go home, shower, and sleep until time to leave for his job at Mahle. That schedule continued until Thursday night when the appellant would be off until Sunday night. While the appellant worked two full-time jobs, he was in good health but tired.

The appellant testified that his wife left for Africa on Saturday, October 3, 2009. After she left, the appellant and the victim dropped off JW for a football game, went grocery shopping, and went to JW's football game. The victim wanted Adam McGreevy to come to the apartment, so the appellant telephoned his wife and asked what she thought. Mrs. Whitehair said McGreevy could come over as long as the appellant was "close by." About 5:30 p.m., the appellant picked up McGreevy from his home and met McGreevy's mother. That night, the appellant, McGreevy, the victim, and JW watched a movie in the living room. Afterward, someone picked up McGreevy and drove him home.

The appellant testified that the following week, the victim and JW were out of school for fall break. The appellant worked both jobs some days and only one job some days. On the nights he worked at Mahle, his mother stayed with the children. On the evening of Tuesday, October 6, the appellant did not work at Mahle. The victim asked to go to the mall, and the appellant dropped her off. He said he knew she was going to meet McGreevy.

The appellant testified that on Friday, October 9, the victim asked if McGreevy could come to the apartment again. The appellant told her yes, and a friend brought McGreevy to the home. McGreevy and the victim watched a movie in the living room while the appellant and JW watched a movie in another room. The appellant sent JW to check on McGreevy and the victim about every twenty minutes. However, the third time, the appellant went to check on them himself. He said that he saw McGreevy on top of the victim and that when McGreevy heard him coming, McGreevy "pulled his hands out from . . . the upper part of [the victim]." The appellant told McGreevy to leave, so McGreevy got his shoes and went outside. The victim was upset and ran outside after him. A couple of minutes later, the victim texted the appellant that McGreevy did not have a ride home. The appellant drove McGreevy home, the victim and JW went with them, and no one spoke during the drive. After the appellant dropped off McGreevy, he noticed the victim "fiddling" with her phone and asked for it. He said that he was angry and "flung it up onto the dashboard." When they got home, the appellant "grounded" the victim. He returned her phone the next day.

The appellant testified that he worked at Mahle the night of Sunday, October 11, that his mother stayed with the children, and that he did not work either job on the 12th, 13th, or 14th. The children returned to school on Monday, October 12. The appellant picked up the victim from school about 4:30 p.m., and they picked up JW. The three of them got home about 6:30 p.m., the appellant made dinner, and the children did their homework.

The appellant testified that about 9:30 p.m. on October 13, Detectives Roberts and Lawson arrived. The appellant answered the door, and the officers asked to speak with the victim. The appellant pointed to her bedroom and said, "[Y]es, she's in there." Detective Roberts went to speak with the victim while Detective Lawson remained in the dining area with the appellant and JW. Detective Lawson talked with JW about football, and JW went to his bedroom. The appellant started to ask Detective Lawson why the officers were there, and Detective Lawson suggested they step outside. The appellant and Detective Lawson went into the breezeway, and Detective Lawson told the appellant that "Matt, there's allegations that you're having inappropriate behavior . . . with your daughter." The appellant replied, "I don't know anyone who would hate me enough to make that kind of phone call." They went back inside, and Detective Roberts spoke with

Detective Lawson. Detective Lawson asked the appellant, "[I]s there anything that [the victim] should be upset with you about[?]" The appellant answered, "[N]o, . . . there shouldn't be." Detective Lawson hit his fist on the table and stated, "That's not what I asked you, Mr. Whitehair." The appellant said he was "taken [aback]" by Detective Lawson and that the officers had the victim transported to the police department. The appellant also went to the police department and was arrested and jailed. He said that he never had sexual relations with the victim, that he never touched her breasts over or under her clothes, and that he never had oral sex with her.

On cross-examination, the appellant acknowledged that his job at Mahle involved melting plastic and had "a certain odor to it." He said, though, that the odor did not smell like burned popcorn but like "[b]urnt motor oil." The appellant said the victim had been afraid of sleeping in the dark since she was young and that she slept with a night-light on. The appellant did not go into the victim's room to check on her after she went to sleep. When the victim was in the seventh grade, the appellant and the victim talked about her going to a dance. However, the victim did not specifically ask him for permission to attend the dance. He said that his wife was not "hard" on the children but that she may have been slightly stricter than he. He acknowledged that the children sometimes asked him to talk with their mother but said that they often went to her first.

The appellant testified that on Tuesday, October 6, 2009, he worked until 4:30 p.m. He did not work that night, took the victim to the mall about 6:00 p.m., and picked her up about 9:00 p.m. The appellant said that on the night of October 9, he caught the victim and McGreevy "laying on the couch making out." He stated that he did not yell at McGreevy but that McGreevy "could tell I was serious" about McGreevy's having to leave. The appellant denied that he was angry because McGreevy was "moving in on his territory" and denied that he was angry about the victim's liking McGreevy. He said he was upset because the victim had violated his trust and the rules of their home. The appellant said the car ride to McGreevy's house was quiet but not "strange." After the appellant took the victim's phone, he did not check the text messages on it.

The appellant testified that when Detectives Lawson and Roberts arrived on October 13, he told them that "she was in there." Detective Roberts walked by the appellant, and the appellant did not say anything to him. The appellant thought the officers wanted to talk with the victim about something that had happened at the mall. When Detective Lawson asked if the victim could be upset with the appellant, the appellant did not think about the victim's being angry with him for making McGreevy leave on October 9 and told the officer no. Detective Lawson hit the table as if he did not believe the appellant. The appellant did not clean the apartment before the officers arrived, and Detective Roberts did not mention the cleanliness of the apartment to him. When the victim testified that he cleaned the apartment, she was lying. He said that he

and the victim used to have a close relationship, that he loved both of his children, and that he never had inappropriate contact with the victim.

In the State's rebuttal case, Detective Lawson testified that when he and Detective Roberts arrived at the apartment on October 13, 2009, he told the appellant that Detective Roberts needed to speak with the victim. He said he did not remember the appellant's saying anything. Detective Lawson sat at a small kitchen table and talked with JW while Detective Roberts went to the victim's bedroom. JW then went to his room, and Detective Lawson gave the appellant a brief statement as to why the officers were there. He said that they never went outside and that he would not have left Detective Roberts in the apartment alone. On cross-examination, Detective Lawson acknowledged that the appellant may have said okay or nodded when Detective Lawson said they were there to speak with the victim.

Detective Roberts was recalled by the State and maintained that he mentioned the cleanliness of the apartment to the appellant. He said the appellant "indicated that he had been cleaning and washing all day getting ready for Melissa to come back from Africa." On cross-examination, Detective Roberts testified that when he initially told the appellant that he needed to speak with the victim, the appellant "made a point across, and said something to the effect of okay or a mumble or something like that[.]" He acknowledged that he did not say anything in his report about the appellant's cleaning or doing laundry.

Jenny Lester testified that she met the victim in high school, that they were in a class together, and that they were friends. The victim had an honest reputation and a truthful character. On cross-examination, Lester testified that she met the victim in September 2010 and that she did not know anything about this case until she was contacted by the State a few days before her testimony. She said that she had not seen the victim since the victim moved to New York but that they had maintained contact. When Lester and the victim were juniors in high school, they lied to their mothers about where they were going after their junior prom. However, their mothers "caught" them in the lie, and they immediately confessed.

Wendy Lawless testified that she coached the victim, who was a cheerleader, in the eighth grade. The victim was always very quiet, was never dishonest, and did what Lawless asked of her. She said that the victim was "sweet" and that she had not seen the victim since the victim left middle school.

Patricia Hillis testified that she was a school resource officer at the victim's middle school from 2005 to 2008. The victim was a cheerleader, and Hillis "had to do a conflict resolution" between the victim and another girl. She said that the victim was honest about the situation," that the victim was "always a good girl, good student," and

that the victim did not get into trouble. On cross-examination, Hillis testified that she had not spoken with the victim since the victim left middle school.

At the conclusion of Hillis's testimony, the jury found as follows:

| Count | Elected Offense | Convicted Offense |
|---|---|---|
| 1 | Rape of a child - vaginal penetration in victim's bedroom | Simple assault |
| 2 | Rape of a child - vaginal intercourse to attend homecoming dance | Aggravated sexual battery |
| 3 | Rape of a child - vaginal intercourse to attend Valentine's dance | Aggravated sexual battery |
| 4 | Rape by force or coercion - vaginal intercourse to get MySpace account | Sexual battery |
| 5 | Rape by force or coercion - anal intercourse to see CJ before he left for summer | Sexual battery |
| 6 | Incest - vaginal penetration in victim's bedroom | Attempted incest |
| 7 | Incest - vaginal intercourse to attend homecoming dance | Attempted incest |
| 8 | Incest - vaginal intercourse to attend Valentine's dance | Attempted incest |
| 9 | Incest - vaginal intercourse to get MySpace account | Attempted incest |
| 10 | Incest - penetration so McGreevy could come to apartment and watch movies | Attempted incest |
| 11 | Incest - anal intercourse to see McGreevy at mall | Incest |
| 12 | Incest - kissed victim's breasts and performed oral sex on her | Not guilty |
| 13 | Incest - vaginal intercourse to reconcile with CJ | Not guilty |
| 14 | Statutory rape by an authority figure - anal intercourse to see McGreevy at mall | Statutory rape by an authority figure |
| 15 | Statutory rape by an authority figure - vaginal penetration on October 12 | Not guilty |
| 16 | Statutory rape by an authority figure - vaginal intercourse to reconcile with CJ | Not guilty |
| 17 | Sexual battery by an authority figure - kissed victim's breasts and performed oral sex on her | Sexual battery by an authority figure |

After a sentencing hearing, the trial court sentenced the appellant to eleven months, twenty-nine days in count one, a Class A misdemeanor; eight years at 100% in counts two and three, Class B felonies; one year to be served on supervised probation in counts four and five, Class E felonies; three years to be served on supervised probation in counts six through ten, fourteen, and seventeen, Class D felonies; and four years to be served on supervised probation in count eleven, a Class C felony. The court ordered that the appellant serve his sentences in counts one through five, fourteen, and seventeen concurrently for an effective sentence of eight years at 100%; that he serve his three-year probation sentences in counts six through ten concurrently with each other but consecutively to the eight-year sentence; and that he serve his four-year probation sentence consecutively to the effective three-year probation sentence for a total effective sentence of eight years in confinement followed by seven years on probation.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the convictions because the victim's allegations were "objectively unbelievable" and the jury "issued a clear 'compromise verdict.'" The appellant notes that defense counsel repeatedly impeached the victim on cross-examination and that no physical evidence supports her accusations. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The victim testified extensively about various acts of sexual abuse that occurred from the time she was eleven until she was fifteen years old. "Generally, a defendant may be convicted upon the uncorroborated testimony of one witness." State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In any event, the victim's testimony was not totally devoid of corroboration. The victim testified that on the night of October 9, 2009, the appellant stood behind her, put his arms around her, and touched her breasts over her clothes. Adam McGreevy testified about an "odd" incident in the kitchen in which the appellant stood behind the victim and put his arms around her. Other witnesses, including witnesses for the appellant, gave testimony that corroborated the victim's testimony. Although the witnesses did not specifically corroborate any sexual abuse, their testimony corroborated other facts and events that could have lent credence to the victim's claims. Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "[t]he weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury obviously resolved the issue of credibility regarding certain counts and lesser-included offenses in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

Moreover, "the reconciliation of conflicts in the proof" is entrusted to the trier of fact. State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008)). In our view, the jury's verdicts reflect a careful reconciliation of the conflicts in this case. Regarding the lack of physical evidence, defense counsel made that argument to the jury, and the jury found the appellant guilty of only two of sixteen counts that charged sexual penetration. We conclude that the evidence is sufficient to support the appellant's convictions.

## B. Rule 412

The appellant contends that the trial court erred by ruling that he could not cross-

examine the victim about other sexual acts with the appellant pursuant to Tennessee Rule of Evidence 412, arguing that such questioning was necessary to show that the victim's allegations were "so numerous as to be unbelievable." He contends that Rule 412 was inapplicable and that, if applicable, the State opened the door to the questioning. The State argues that the trial court properly limited the defense's cross-examination under the Rule. We conclude that this issue has been waived.

During cross-examination of the victim, defense counsel asked about "the first time your father allegedly had sex with you," and the State requested a bench conference. At the bench, the prosecutor advised the trial court that she believed the appellant was about to ask the victim about the appellant's touching her on the floor of her parents' bedroom while her mother slept in the room and that defense counsel "failed to provide a 412 Motion that he intended to ask about things outside the indictment, sexual acts outside the indictment." Defense counsel responded that the State's questions on direct had suggested that the appellant was having sex with the victim many more times than was alleged in the bill of particulars and, therefore, that the State had opened the door to counsel's questioning the victim about those additional acts. The State argued that the victim had not testified outside the ten incidents alleged in the bill of particulars and requested a jury-out hearing "before anything else is brought up."

The court held the hearing as requested, and defense counsel argued that he did not need to file a motion pursuant to Rule 412, Tennessee Rules of Evidence, because "[t]his all goes to credibility, and, it goes to explain what her testimony has already been." The State maintained that Rule 412 applied. The trial court stated that it wanted a written offer of proof from defense counsel regarding the instances of conduct he wanted to question the victim about and recessed for lunch. After the lunch break, defense counsel advised the court that he "did provide an offer of proof as quickly as [he] could." Upon reviewing the written proffer, the court stated as follows:

> [M]ost of this offer of proof concerns prior inconsistent statements and not allegations of specific sexual conduct by the defendant, which is what Rule 412 seeks to avoid. So, I think my preference would be to have [the victim] take the stand, allow the defense to ask her those questions, and then make a determination whether or not Rule 412 would apply and whether or not the proof should be admissible under the exceptions to 412.

The victim returned to the stand, and defense counsel questioned her about the incident on her parents' bedroom floor.

- 23 -

At the conclusion of her hearing testimony, the trial court told defense counsel to "go ahead and you ask her the questions that you want to ask her concerning other specific acts so that I can make a determination whether or not I'm going to allow you to ask her those on cross-examination [pursuant to Rule 412]." Defense counsel then questioned the victim about the incidents alleged in the bill of particulars and the appellant's spitting on his hand for lubrication. Eventually, the trial court interrupted defense counsel, and the following colloquy occurred:

> THE COURT: All right. We've been going for about 35 minutes, and so far, there's only been one incident of specific sexual activity other than that that's previously been testified to . . . , and that was the activity that allegedly occurred on the floor in [her] mother's bedroom . . . . The rest of these questions are questions on prior inconsistent statements related to the testimony that she's given here at trial.
>
> . . . .
>
> I don't have any problem with you asking about prior inconsistent statements. . . . Is there something in this offer of proof that relates to a specific activity outside of that first time on the floor in the mother's bedroom that you wanted to get into?
>
> [Defense counsel]: Yes, Your Honor. If I might, I will ask her isn't it true that she stated, previous testimony, that these things happened multiple times, approximately once per month, over the, each -- over her 6th grade year, her 7th grade year, and her 8th grade year, and that will get you 12 instances right there.

The State responded, "I would object to that. . . . [T]hat's not specific instances of [conduct]." The trial court stated that "[w]e're not going to go any farther with it today" and ordered that defense counsel prepare for the State "exactly what it is that you plan to put before [the victim] . . . and . . . specific allegations of specific conduct you're going to ask her to testify to."

The next morning, the trial court stated for the record that defense counsel had filed a motion "on Rule 412 and Offer of Proof." In the motion, defense counsel "move[d] the Court to offer evidence of a specific instance of the alleged victim's sexual behavior. To wit, the alleged victim first alleges that she engaged in sexual behavior with

the Defendant in the sixth grade prior to Count 1 of the Indictment." The motion further provided that after the appellant's arrest, the victim told her mother at the police department that her first sexual encounter with the appellant occurred on the floor of her parents' bedroom while she was sleeping on the floor of the room and her mother was sleeping in the bed next to her.

The trial court ruled that defense counsel could question the victim about the incident in her parents' bedroom "since that's all you've asked the Court to allow you to testify to." The trial court also ruled that, in any event, the 50 or 60 different encounters of specific events, would be confusing to the Jury, would be outside the scope of the indictment and what we're here for trial for."

On appeal, the appellant contends that the trial court properly allowed defense counsel to ask the victim about the alleged incident on the floor but improperly prevented counsel from "exploring the dozens of other incidents suggested by the alleged victim, which could have certainly impacted her credibility" pursuant to Tennessee Rule of Evidence 412. He claims that Rule 412 did not apply under these circumstances and that, in any event, the State opened the door to cross-examination about the other sexual acts.

We conclude that the appellant is not entitled to relief. The trial court requested during the jury-out hearing that defense counsel make an offer of proof as to his proposed questions and the victim's answers, but counsel never did so. The trial court also instructed defense counsel to file a written motion advising the State of his planned questions. In response, defense counsel filed a motion only requesting that he be allowed to ask the victim about the incident on her parents' bedroom floor. The trial court ruled that defense counsel could question the victim about the incident "since that's all you've asked the Court to allow you to testify to." In short, no offer of proof as to additional sexual acts, if any, is in the appellate record. See Tenn. R. App. P. 36(a). Moreover, while we agree that the State opened the door to questioning the victim about additional acts when it alluded to them on direct examination, without an offer of proof, the appellant cannot demonstrate prejudice from his not being allowed to question the victim. See Tenn. R. Evid. 103(a)(2); Tenn. R. App. P. 36(b).

## C. Expert Testimony

The appellant contends that the trial court erred by ruling that Sara Hampshire qualified as an expert, which allowed her to give her opinion that the victim had been sexually active for "some time" and had engaged in numerous acts of vaginal intercourse. He claims that Hampshire lacked the experience and scientific methodology to give her opinion and that the State should not have been allowed to change its position during trial that Hampshire would not testify as an expert. The State argues that the court properly

allowed Hampshire to testify. We agree with the State.

Before trial, the appellant filed a motion in limine to exclude any expert testimony by nurse practitioner Hampshire. In the State's written response, it requested that the court deny the motion because "this is a fact witness who is expected to testify to the results and conclusions of the examination that she performed based on her immediate assessment of the perceived changes or damages to the victim's body." The trial court filed an order denying the motion, stating, "State witness is presented as fact witness. The Court reserves the right to conduct an out-of-jury hearing if there is any testimony based on a witness's opinion."

Before Hampshire's direct examination testimony, the State decided to qualify her as an expert, and the trial court held a jury-out hearing. During the hearing, Hampshire stated that she obtained her masters degree in nursing and began practicing in 1975. She became a member of the nursing faculty at Vanderbilt where she taught medical students how to perform pelvic examinations and created a program titled "Teaching Medical Students How to do Pelvic Exams Using Patient Surrogates." In 1982, Hampshire began working for a two-physician private practice in obstetrics and gynecology and had her own patients, seeing ten to thirty patients per day. She said that she performed checkups on, diagnosed, and treated patients and that she performed "routine anal exams, a head-to-toe-kind of physical, heart, lungs, abdominal exam, pelvic exam, rectal exam." She was still working for the practice when she examined the victim. She estimated that she had performed "[t]housands and thousands" of vaginal and rectal examinations and said that she retired four months before the appellant's trial.

Upon being questioned by the defense, Hampshire acknowledged that her nursing license was still "active" and that a physician "signed off" on every examination she performed. Hampshire's patients were always female, and she "saw some young girls." Her youngest patient was twelve or thirteen years old. She said that she had "[z]ero" training in forensic gynecology and that this was the first case in which she had been asked to testify regarding a patient's being sexually active. She said, though, that this was not the first time a mother had asked her to determine if a daughter was sexually active. She stated that the only way to determine whether a girl was sexually active, absent an injury, was the "lack of a tight hymenal ring" at the entrance of the vagina. She stated that the vagina of most young women would accommodate a small finger but not a tampon and that "[a] person who's been having intercourse, it's no longer tight and will accommodate a much larger object."

At that point, defense counsel requested a "Daubert hearing," and the trial court allowed counsel to question Hampshire "about what techniques she uses and whether or not [they're] based on science." Hampshire stated that she had "no forensic training

whatsoever" and that she had "never dealt with a, a sexual abuse issue other than, than this one." She said that she did not know whether she qualified as an expert but that she had "done a whole lot of exams." Defense counsel asked if she followed "certain scientific protocol," and she answered that her examinations included obtaining the patient's past medical and social history. She acknowledged that she planned to testify that the victim had "a mature vaginal vault" and that her opinion was based on her experience, not forensic training. She said that she "would be a fool to say [she's correct]" all of the time but that she could not be incorrect regarding her conclusions in this case.

The trial court noted that the State "never told me what it was that you wanted Ms. Hampshire to be qualified as" but that it found her qualified to testify as an expert "in the field of nurse practitioner." The court ruled that she could give her opinion about the victim's pelvic exam and stated that it would give a limiting instruction regarding her testimony. On direct examination, Hampshire testified that the victim had been sexually active for "some time" and had engaged in numerous acts of vaginal intercourse.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Rule 703 requires that the expert's opinion be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993), the United States Supreme court held that Federal Rule of Evidence 702 requires that a trial court "ensure that any and all scientific testimony. . . is not only relevant, but reliable." In McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997), our supreme court set forth the following list of factors that may be useful to a trial court in determining the reliability of scientific evidence:

> A Tennessee trial court may consider in determining reliability: (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or

publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by Frye, the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

Nonscientific expert testimony is based on "'specialized knowledge,' that is, the expert's experience." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). In determining whether the testimony of a proffered nonscientific expert should be admitted, trial courts may consider the following:

> (1) the McDaniel factors, when they are reasonable measures of the reliability of expert testimony; (2) the expert's qualifications for testifying on the subject at issue; and (3) the straightforward connection between the expert's knowledge and the basis for the opinion such that no "analytical gap" exists between the data and the opinion offered.

Id. at 834-35.

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987); see Brown v. Crown Equip. Corp., 181 S.W.3d 268, 275 (Tenn. 2005). This court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Regarding the appellant's claim that the State should not have been allowed to qualify Hampshire as an expert "at the last minute," defense counsel was well-aware from the trial court's order that a jury-out hearing on the issue could be necessary. As to Hampshire's being qualified to testify as an expert, Hampshire obtained her masters degree in 1975. At the time of trial, she had almost forty years of experience. She taught medical students how to perform pelvic exams and performed thousands of such exams herself. She stated that she had examined patients as young as twelve and that mothers previously had asked her to determine whether their daughters were sexually active. Hampshire explained the results of the victim's pelvic exam and how she reached her opinion regarding the victim's sexual experience. This court has repeatedly upheld rulings in which nurse practitioners were allowed to give expert opinions regarding

gynecological exams performed on victims alleging sexual abuse. See State v. Paul Wallace Dinwiddie, Jr., No. E2009-01752-CCA-R3-CD, 2010 WL 2889098, at *11-12 (Tenn. Crim. App. at Knoxville, July 23, 2010); State v. Frederick Leon Tucker, No. M2005-00839-CCA-R3-CD, 2006 WL 547991, at *6-7 (Tenn. Crim. App. at Nashville, Mar. 7, 2006); State v. Albert B. Holston, No. 02C01-9210-CR-00247, 1993 WL 350162, at *3 (Tenn. Crim. App. at Jackson, Sept. 15, 1993). Thus, we cannot say that the trial court abused its discretion by allowing Hampshire to testify as an expert about the victim's pelvic exam.

### D. Prosecutorial Misconduct

The appellant contends that he is entitled to a new trial based upon repeated and deliberate prosecutorial misconduct committed during the presentation of proof and closing arguments. The State argues that the appellant is not entitled to relief. We agree with the State.

Before trial, the appellant filed a motion in limine requesting that the trial court prohibit the State from "any mention or reference to the family history of the Defendant and the victim" on the basis that such evidence was irrelevant and, if relevant, "more prejudicial than probative." The trial court addressed the motion in a written order, stating only, "Granted."

During the trial, the State repeatedly questioned witnesses about the victim's relationship with her family after her allegations surfaced. For example, the victim testified on direct examination that her allegations caused her family to fall apart, and the State asked when was the last time she saw her parents. Defense counsel objected based on relevance, the attorneys approached the bench, and the trial court ruled, "I'll allow her to answer that question once. That's the only question I want concerning anything that happened after these events that we're apart at trial as far as family relationship on direct examination." When direct examination resumed, the victim testified that she had not seen her mother in more than two years. On redirect examination, the State asked if any family members were present at the juvenile court hearing to support the victim, and defense counsel objected, again based on relevance. The State advised the court that the victim's credibility was at issue and that the fact that the victim "was stressed, she was under duress, and she was alone and fifteen" was relevant "to what was or not said during a six hour cross-examination" at the hearing. The trial court ruled that the State could "ask questions that bring about that evidence" but that questions regarding who was present to support the victim or the appellant were irrelevant. The victim then testified that she was exhausted at the juvenile court hearing, that she had multiple opportunities to recant her allegations, that she would not have disrupted her life "for something like this," and that her grandparents were in the lobby, not the courtroom, during the juvenile

hearing. Shortly thereafter, the victim testified that no one was present with her during the appellant's preliminary hearing.

The appellant contends that the State elicited further improper testimony about the victim's family history by questioning the victim about her relationship with her brother and by having the victim's grandmother testify when she could offer no relevant testimony to the case. The appellant also contends that during closing arguments, the prosecutor improperly stated as follows:

> Now, she testified that she lost everything. That she was afraid she would lose her family if she told anybody. She did lose her family. When this came out -- you heard her mother's testimony. You heard her brother's testimony. The only one, again, who still loves her is Matthew Whitehair. She was right in believing she would lose her family.[5]

In order to prevail on a claim of prosecutorial misconduct, the appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of

---

[5] The appellant did not object to the prosecutor's argument.

- 30 -

unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Turning to the instant case, the appellant argued in his motion in limine and during the State's questioning of the witnesses that the victim's family history, specifically, the loss of her family and lack of support by family members, was irrelevant. The trial court agreed, granting his motion and sustaining many of defense counsel's objections. However, "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Here, the appellant's primary defense was that the victim was lying, and defense counsel vigorously attacked her credibility during its cross-examination of the witnesses. The State tried to rehabilitate the victim by showing that she had remained steadfast in her allegations despite the loss of her family and the disruption to her life. In our view, such evidence was a logical, and relevant, response to the appellant's defense. In any event, even if the evidence was irrelevant, we fail to see how the appellant was prejudiced. The fact that the victim's family, particularly her own mother, did not believe or support her was highly beneficial to the appellant and detrimental to the State. Moreover, throughout the trial, the defense tried to capitalize on the fact that the victim's immediate family and

friends did not believe her. Therefore, we conclude that the appellant is not entitled to relief on this issue. See Tenn. R. App. P. 36(b).

## E. Unanimous Verdict

The appellant contends that the State made an improper election of offenses in count seventeen, sexual battery by an authority figure, because the State alleged that he committed two discrete acts, kissing her breasts and having oral sex with her at different times. He claims that the improper election failed to protect his right to a unanimous verdict. The State argues that the appellant waived this issue because he failed to include it in his motion for new trial and that he is not entitled to plain error relief. We agree with the State.

On direct examination, the victim testified that in addition to having vaginal and anal intercourse with her, the appellant had oral sex with her. Specifically, he put his mouth on her "private." The victim said that the act occurred in the appellant's bedroom when she was fifteen years old and while her mother was in Africa. She said that the appellant moaned during the incident and that no other sexual incidents occurred that day. The victim said that when she was fourteen or fifteen years old, the appellant told her to pull up her shirt and bra and put his mouth on her breasts. She did not remember the date of the incident but said it occurred in the hallway of their apartment. The State asked if she had "any recollection of the time frame" between the oral sex and the kissing incidents, and the victim said, "I don't know. It was a long time ago." However, she acknowledged that she thought both of them occurred while her mother was in Africa.

After the the victim's direct testimony, the jury left the courtroom, and the State advised the trial court that "[the eighth] incident has two parts and there's two parts on the bill of particulars, lifted her shirt, kissed her breasts, and then had oral sex." The trial court stated that "[t]he only confusion I have is whether or not the oral sex and lifting her shirt and touching her breasts occurred at the same time" and that "I have those separated[.]" On cross-examination, the victim testified that the two incidents occurred on the same day. She said that the appellant kissed her breasts first and then had oral sex on her "[l]ater that day."

At the close of the State's case-in-chief, the State made the following written election with regards to counts twelve and seventeen: "Matthew Whitehair lifted up her shirt and kissed her breasts and performed oral sex on [her]. She was over 13 and under 18. Matthew Whitehair was her father at the time." During closing arguments, the State argued,

Now, this talks about some of the elements of sexual

- 32 -

battery by an authority figure. And, again, you have got the jury instructions that have all those in there. We're not trying to hide anything from you.

Event number eight. [The victim] was over the age of 13 and under the age of 18. And Matthew Whitehair lifted her . . . lifted the victim's shirt and kissed her breasts. He later performed oral sex on her for the first time. This also occurred in her fathers's bedroom, which was also her mother's bedroom.

Now, oral sex is also considered penetration by the definition, the legal definition. Now, she didn't remember what day this happened. And there was an attempt to go through a calendar and have her specifically say what date this was and what date was this. And there was a lot of writing by [defense counsel] and a lot of question marks on there.

The jury acquitted the appellant of incest in count twelve but convicted him as charged of sexual battery by an authority figure in count seventeen.

As noted by the State, the appellant failed to include this issue in his motion for new trial. Therefore, we review the issue for plain error. See Tenn. R. App. P. 3(e); State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015). Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We may consider an issue to be plain error when all five of the following factors are met:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'plain error' must be of such a great

magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

As our supreme court recently explained,

> "[W]here [an] indictment charges that sex crimes occurred over a span of time, evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible." State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). The State, however, must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction. Id. The two primary purposes of this election requirement are "to preserve a criminal defendant's right under the state constitution to a unanimous jury verdict, and to allow the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed." Id. (citing State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988)). . . . When applying plain error review, appellate courts must bear in mind that the election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and indeed, as this Court has recognized, the election requirement may be satisfied in a variety of ways.

Knowles, 470 S.W.3d at 423-24.

The State does not have to identify a date for the particular offense. Id. at 424 (citing Shelton, 851 S.W.2d at 137). Instead, the prosecutor may identify a particular type of abuse and have the victim describe unique circumstances to identify the event. Id. However,

> the election requirement applies to offenses, not to the facts supporting each element of the offense. This is true because a jury is not required to "unanimously agree as to facts supporting a particular element of a crime so long as the jury agrees that the [defendant] is guilty of the crime charged." State v. Adams, 24 S.W.3d 289, 297 (Tenn. 2000).

Id.

Incest occurs when a person engages in sexual penetration with a person while knowing the person to be the person's child or stepchild. Tenn. Code Ann. § 39-15-302(a)(1). "'Sexual penetration' means sexual intercourse, cunnilungus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). Sexual battery by an authority figure as charged in this case is

> unlawful sexual contact with a victim by the defendant . . . [and] . . . [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less [than] eighteen (18) years of age . . . [and] . . . [t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the used the authority to accomplish the sexual contact.

Tenn. Code Ann. § 39-13-527(a)(1), (a)(3)(B). "Sexual contact" includes the intentional touching of a victim's intimate parts if the touching can be reasonably construed as being for the purpose of sexual arousal or gratification. Tenn. Code Ann. § 39-13-501(6).

Turning to the instant case, we are puzzled as to why the State relied on two specific incidents, separated by time and place, for the single offense of sexual battery by an authority figure. Even more puzzling is the trial court's expressing its own confusion, yet allowing the State to rely on the two incidents and instructing the jury as follows:

> In this case, the State has elected to submit for your consideration the alleged acts of sexual battery by an authority figure, Count [seventeen], and incest, Count [twelve] ocurring when Matthew Whitehair lifted up [the victim's] shirt and kissed her breast and performed oral sex on her when she was over 13 and under 18, and he was her father.

Nevertheless, we conclude that the appellant is not entitled to plain error relief. The two incidents involved separate crimes in that the oral sex involved "sexual penetration" by cunnilingus whereas the kissing of the victim's breasts involved "sexual contact." The trial court properly instructed the jury that incest required sexual penetration, that sexual penetration included cunnilingus, and that cunnilingus "means a sex act accomplished by placing the mouth or tongue on or in the vagina of another." The trial court also properly instructed the jury that sexual battery by an authority figure required sexual contact, that sexual contact included the intentional touching of the

victim's intimate parts, and that intimate parts included "the primary genital area, groin, inner thigh, buttock, or breast." Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Furthermore, the jury found the appellant guilty as charged of sexual battery by an authority figure in count seventeen but found him not guilty of incest in count twelve. In our view, the verdicts demonstrate that the jury understood the sexual act required for each crime and that it accredited the victim's claim of kissing her breasts but rejected her claim of oral sex. In sum, "we are not persuaded that the error in the State's election was so significant that it 'probably changed the outcome of the trial.'" Knowles, 470 S.W.3d at 428 (quoting State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010)).

F.  DCS File

The appellant contends that this court should allow his counsel to review the victim's DCS file or, in the alternative, conduct its own in camera review of the file, which was generated in response to the victim's allegations. He acknowledges that, pursuant to his request, the trial court conducted an in camera review of the sealed file before trial but argues that "to be capable of exercising his 'constitutional right to present a defense,' the records must be produced to his counsel and any expert who may be necessary to present elements of his defense to the jury." The State argues that the trial court properly reviewed the file. We agree with the State.

Before trial, the appellant attempted to subpoena the victim's DCS file. DCS filed a motion to quash the subpoena or for the trial court to conduct an in camera review of the records. The appellant responded to the motion, stating that he had no objection to the trial court's placing the file under seal and conducting its own in camera review for exculpatory material. The trial court agreed to review the file. Subsequently, the trial court filed a written order in which it stated that it had reviewed the DCS materials and that it did not find any Brady material.

At the conclusion of the victim's trial testimony, defense counsel requested that the trial court review the file again "in light of her testimony today," and the court stated that it would take the matter under advisement. After DCS investigator Kevin Smith's direct testimony, defense counsel requested that they be allowed to review the DCS file in preparation for cross-examination. The court stated that it had reviewed the file before trial and that it had found no exculpatory information. The court denied counsel's request that the court re-review the file and denied counsel's request to review it.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001).

As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963). "Under Pennsylvania v. Ritchie, a DCS file may be submitted to a trial court for in camera review, and if a defendant is aware of specific information in the file, he may request it from the court and argue its materiality." Charles Ritter v. State, No. E2008-01278-CCA-R3-PC, 2009 WL 3711991 at *8 (Tenn. Crim. App. at Knoxville, Nov. 6, 2009) (citing Ritchie, 480 U.S. 39, 60 (1987)).

In this case, the trial court reviewed the victim's DCS file as the appellant had requested and determined that it did not contain Brady material. Nothing indicates that the file contained exculpatory information. Therefore, we conclude that the trial court did not err by refusing to review the file again or by denying counsel's request to review it. Moreover, we decline the appellant's invitation to review the DCS records.

G. Aggravated Sexual Battery Convictions

At oral argument, the appellant claimed that aggravated sexual battery was not a lesser-included offense of rape of a child in light of this court's recent opinion in State v. John J. Ortega, Jr., No. M2014-01042-CCA-R3-CD, 2015 WL 1870095 (Tenn. Crim. App. at Nashville, Apr. 23, 2015), no perm. to appeal filed, thus mandating that we modify his aggravated sexual battery convictions in counts two and three to child abuse. We disagree with the appellant.

During the jury charge, the trial court correctly instructed the jury on rape of a child in counts one through three as "unlawful sexual penetration of [the victim]; and that [the victim] was more than 3 years of age, but less than 13 years of age; and that the Defendant acted either intentionally, knowingly, or recklessly." See Tenn. Code Ann. § 39-13-522(a). The trial court then instructed the jury on the lesser-included offenses of attempted rape of a child, aggravated sexual battery, attempted aggravated sexual battery, child abuse, attempted child abuse, simple assault, and attempted simple assault. Regarding the instruction on aggravated sexual battery, the trial court stated that in order for the jury to find the appellant guilty of that offense, the State must have proven that

> [t]he Defendant had unlawful sexual contact with [the victim] in which the Defendant intentionally touched [the victim's] intimate parts, or the clothing covering the immediate area of [the victim's] intimate parts; and that [the victim] was less than 13 years of age; and that the Defendant acted either intentionally, knowingly, or recklessly.

- 37 -

See Tenn. Code Ann. § 39-13-504(a)(4). The jury convicted the appellant of simple assault as a lesser-included offense of rape of a child in count one and aggravated sexual battery as a lesser-included offense of rape of a child in counts two and three.

After the hearing on the appellant's motion for a new trial, this court held in Ortega that pursuant to our legislature's 2009 amendment of Tennessee Code Annotated section 40-18-110, aggravated sexual battery was no longer a lesser-included offense of rape of a child. No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *10. The court explained that the amendment, which codified the test established by State v. Burns for determining whether an offense qualified as lesser-included offense of the charged offense, eliminated part (b) of the Burns test. Id. at *8-10 (citing Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999)). As a result, this court modified Mr. Ortega's conviction of aggravated sexual battery to child abuse. Id. at *11. Since Ortega, this court has again held that aggravated sexual battery is no longer a lesser-included offense of rape of a child under Tennessee Code Annotated section 40-18-110 as amended. See State v. Glen B. Howard, No. E2014-01510-CCA-R3-CD, 2015 WL 4626860, at *15 (Tenn. Crim. App. at Knoxville, Aug. 4, 2015), perm. to appeal granted, (Tenn. 2015).[6]

Initially, we note that although the appellant did not object to the aggravated sexual battery instruction at trial, such failure to object "in this situation" does not waive the issue. Ortega, No. M2014-01042-CCA-R3-CD, 2015 WL 1870095, at *7 (holding that defendant's failure to object to jury instruction on offense that is not lesser-included offense does not constitute an implicit consent to an amendment of the indictment, and, therefore, does not waive the issue on appeal). However, the appellant failed to raise the issue in his motion for new trial. See Tenn. R. App. P. 3(e). Therefore, we will review the issue for plain error. See Tenn. R. App. P. 36(b).

The amendment to Tennessee Code Annotated section 40-18-110 did not take effect until July 1, 2009. Unlike Ortega, the two offenses at issue occurred prior to that date. Therefore, the Burns test still applied. State v. David Lynn Harrison, No. E2008-01082-CCA-R3-CD, 2010 WL 3238309, at *10-11 (Tenn. Crim. App. at Knoxville, Aug. 17, 2010) (concluding that the Burns test applies to offenses committed prior to July 1, 2009); see State v. Cheyne R. Stewart, No. M2014-00074-CCA-R3-CD, 2015 WL 2446753, at *11 (Tenn. Crim. App. at Nashville, May 22, 2015) ("focus[ing] on whether assault is a lesser included offense of rape pursuant to Code section 40-18-110(f)(1) because that statute was in effect at the time of the offense"); but see State v. Windie L.

---

[6] In its order granting permission to appeal, our supreme court stated that it was "particularly interested in the question of whether the Court of Criminal Appeals erred in ruling that aggravated sexual batter is not a lesser-included offense of rape of a child" and directed the parties "to discuss whether part (b) of the test set forth in [Burns] survived the 2009 amendments to Tenn. Code Ann. § [40-18-110]." State v. Glen B. Howard, No. E2014-01510-SC-R11-CD (Tenn. Dec. 11, 2015) (order).

Perry, No. M2014-00029-CCA-R3-CD, 2015 WL 3540554, at *20 & n.9 (Tenn. Crim. App. at Nashville, June 5, 2015) (citing Wiley v. State, 183 S.W.3d 317, 328 (Tenn. 2006), and applying the law on determining lesser-included offenses as it existed at the time of trial, not the time of the offense), perm. to appeal denied, (Tenn. Oct. 15, 2015). The trial court instructed the jury on aggravated sexual battery as a lesser-included offense of rape of a child pursuant to Burns. Thus, the appellant has failed to show that a clear and unequivocal rule of law was breached, and we find no plain error.

### H.  Cumulative Error

The appellant contends that he is entitled to a new trial based upon cumulative error. However, we find no merit to this claim.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE